# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT KUTZER, | ) |
|     *Plaintiff*, | ) Civ. No. 16-1012 |
| v. | ) Magistrate Judge Lisa Pupo Lenihan |
| NANCY A. BERRYHILL,[1] | ) |
| **Acting Commissioner, Social Security Administration,** | ) |
|     *Defendant*. | ) |

## MEMORANDUM OPINION

**I.    Introduction**

Plaintiff Scott Kutzer brings this action pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of Nancy A. Berryhill, Acting Commissioner of Social Security, which denied his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. The matter is before this Court on cross-motions for summary judgment (ECF Nos. 17, 19). The record has been developed at the administrative level.[2] For the reasons set forth below, Plaintiff's motion will be denied, the Acting Commissioner's motion will be granted, and final judgment will be entered in favor of the Acting Commissioner and against Plaintiff.

**II.    Statement of the Case**

    **A.    Procedural History**

Plaintiff filed an application for DIB benefits on May 22, 2013, alleging disability as of

---

[1] Carolyn W. Colvin was Acting Commissioner of Social Security when this action was filed against her in her official capacity. On January 23, 2017, Nancy A. Berryhill succeeded Colvin as Acting Commissioner. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant in this action.

[2] All references to the administrative record, (ECF No. 7), will be cited in the following format: (R. at xx).

August 3, 2011, due to pain in his right and left knees and his right ankle (R. at 134-35, 155). The agency initially denied his application on August 8, 2013, so he filed a request for an administrative hearing, which was held on November 12, 2014, before Administrative Law Judge ("ALJ") David J. Kozma (R. at 34-57, 70-74, 95). Plaintiff appeared with counsel and testified at the hearing, as did an impartial vocational expert (R. at 34-57).

In a decision dated January 29, 2015, the ALJ held that Plaintiff was not "disabled" within the meaning of the Act and therefore denied his application for DIB. (R. at 29-30). After the Appeals Council denied Plaintiff's request for review, he commenced this action on July 7, 2016 (ECF Nos. 1, 3). Plaintiff filed a motion for summary judgment, with a brief in support, on February 10, 2017 (ECF Nos. 17, 18). The Commissioner filed a motion for summary judgment, with a brief in support, on March 9, 2017 (ECF No. 19, 20). The cross-motions are ripe for disposition.

**B.     General Background**

Plaintiff was born on December 13, 1966, making him 44 years old as of his alleged onset date and 47 years old as of the date of the hearing (R. at 38, 134). He graduated from high school, attended some community college, and has past relevant work experience as a hospital housekeeper (R. at 52, 156, 157).

Plaintiff was involved in a head-on collision on August 3, 2011 (R. at 37-38). He severely injured his right knee and right ankle in the accident and had to undergo surgery on his ankle, after which he spent approximately two months in a nursing rehabilitation facility (R. at 38, 42). He has not worked since (R. at 40).

In the wake of the accident, Plaintiff's "right ankle hurts all the time." (Id.). The pain is typically steady, aching, and accompanied by swelling, some days more than others (Id.). He

spends "a good part of the day" – at least a "couple" of hours – sitting in a recliner with his leg elevated (R. at 41). He also ices his ankle every day (R. at 40-42). He does not use a cane, but he does wear a brace on his right knee (R. at 51). In addition to the pain in his right ankle and knee, he more recently started to experience pain in his left knee because he favors his left side when walking (R. at 45).

Plaintiff testified that he cannot bend, kneel, stop, or engage in other postural maneuvers. As a result, he cannot help with household chores such as sweeping and the like (R. at 41-42). He also testified that he cannot do outdoor activities with his children as he once could (R. at 39). However, he can drive "short distances" of approximately 45 minutes to an hour (R. at 41).

### C. Medical Evidence

Following the aforementioned accident, Plaintiff was taken to the emergency room with an open fracture of his right ankle (R. at 393). He also had a broken right patella (R. at 395). An external fixator was implanted to repair his broken ankle, and he was fitted with an external brace for his right knee, which was deemed non-operative (Id.). His orthopedic surgeon, Gary Gruen, M.D., noted at Plaintiff's first follow-up appointment that he would not be able to return to work for approximately one year due to his injuries (R. at 242). A week after the surgery, Plaintiff was admitted to a skilled nursing facility, where he spent approximately two months (R. at 241). While there, he started to undergo physical therapy and showed modest improvement in his ability to ambulate (R. at 206-12).

On October 6, 2011, Plaintiff had his two-month follow-up with Dr. Gruen (R. at 237). At that time, he had still not been allowed to bear any weight on his right side (Id.). His range of motion in his knee was 0 to 75 degrees, while his ankle range of motion was limited (Id.). Dr. Gruen ordered Plaintiff to undergo an MRI to determine weight-bearing status and advised him

of the risks of non-union, malunion, chronic pain, stiffness, avascular necrosis, and the possible need for a future operation (Id.).

On November 14, 2011, Plaintiff began to undergo outpatient physical therapy (R. at 347). Around that same time, he saw Dr. Gruen for another follow-up, and Dr. Gruen noted that Plaintiff was "doing well" (R. at 236). Plaintiff had "[n]o complaints of pain" and asked Dr. Gruen whether he could return to work (Id.). Upon examination, Plaintiff displayed active knee range of motion from 0 to 95 degrees, but limited ankle range of motion (Id.). Dr. Gruen instructed Plaintiff that he could remove his knee brace and "continue 50 % weightbearing in his CAM boot" (Id.). He also noted that Plaintiff could return to work on November 28, but he would have to be limited to "part-time sedentary duties only" (Id.).

In the ensuing months, Plaintiff continued to see his physical therapist three days per week. On November 22, 2011, Plaintiff's physical therapist noted that Plaintiff had just seen his bone specialist, who approved him for full weight-bearing status without a boot and without an assistive device as tolerated (R. at 342). On December 5, 2011, the therapist noted that Plaintiff "continue[d] to make improvements" and was "[w]alking over the weekend with less pain" (R. at 337). The following week, Plaintiff reported pain at "2/10" and "was able to ambulate without [a] walker and boot [for the] entire 60 minutes' worth of exercise" (R. at 333). It was further noted that Plaintiff's endurance was "improving each session." (Id.). The next day, Plaintiff reported less pain but continued to have problems with "endurance and distance with weightbearing" (R. at 331). The next week, Plaintiff's therapist instructed him "to try to walk outside of home for short trips with [a] walker." (R. at 329). On January 3, 2012, Plaintiff reported that "[h]ad some extra pain after walking [a] long period of time in the mall" (R. at 313). Two days later, he reported that his "signs and symptoms ha[d] decreased since [his] last

4

treatment session," while he "continue[d] to see endurance gains" (R. at 311). His therapist noted that he was "progressing toward goals approximately . . . . [He] continue[d] to perform exercises that mimic walking on uneven surfaces with distractions" (Id.).

Around this time, there was a question as to whether Plaintiff's insurance would continue to cover his physical therapy. In a progress noted dated January 10, 2012, Plaintiff's physical therapist noted that Plaintiff "ha[d] made excellent progress" (R. at 269). "His strength [was] 5/5 for all motions and he no longer experienced the buckling of the right knee" (Id.). Furthermore, "[h]e [was] walking with minimal pain[,]" though he "continue[d] to have an antalgic gait with increased stance time on the right foot that [was] related to pain in the heel with weight shifts" (Id.). And while his range of motion had improved, he continued to have "limitations in dorsiflexion to about 5 degrees and eversion to about 8 degrees." (Id.). The therapist noted that she had recently begun working with Plaintiff on "work specific activities and ADL advancement such as walking on uneven surfaces, squatting, curbs, [and] carrying objects over [an] obstacle course" (Id.). She recommended that Plaintiff undergo six more weeks of therapy, after which point she saw "no physical reason" why he "would be unable to return to work" (Id.).

On January 19, 2012, Plaintiff followed up with Dr. Gruen, who noted that Plaintiff was "ambulating in normal shoes" and did not "have any pain with ambulation in his ankle." (R. at 235). "On examination," Dr. Gruen observed, Plaintiff "ambulate[d] into the clinic without antalgia[,]" though his range of motion in his ankle was limited (Id.). Dr. Gruen advised Plaintiff that he might be developing signs of avascular necrosis and recommended that he undergo an MRI (Id.).

On January 20, 2012, Plaintiff was seen for what was supposed to be his last therapy session, as his insurance company had denied continued coverage (R. 299). It was noted that he

had recently stubbed his toe "going up steps . . . too quickly" (Id.).

In a progress note from Plaintiff's physical therapist dated February 6, 2012, it was again noted that Plaintiff had "made excellent progress" since his surgery (R. at 270). The therapist recommended that Plaintiff receive four more weeks of therapy, with two therapy sessions a week, after which time he would likely be able to return to work (Id.).

Plaintiff's insurance company allowed him to continue physical therapy in April 2012 (R. at 297). On May 7, 2012, Plaintiff reported "pain at 3/10 with edema as he ha[d] been on his feet for an extended period of time" (R. at 289). On May 17, 2012, Plaintiff "complained of an increase of stiffness and pain . . . after mowing grass and working in his shed" (R. at 283). The next week, he reported mild improvement in ambulation, but he continued to have limited range of motion in his ankle and "[l]imits in activity over [an] 8 hour period" (R. at 279). On June 5, 2012, he reported that he was "doing more things around the house that cause[d] him to stand on his feet for longer periods of time," which in turn "cause[d] him a slight increase in pain around the lateral ankle." (R. at 271).

At the end of June, Plaintiff had another follow-up with Dr. Gruen, who reported that Plaintiff was "doing well with occasional mild pain" (R. at 233). According to Dr. Gruen's notes, Plaintiff was "trying to return to work," and Dr. Gruen advised him that he could do so and filled out the appropriate paperwork specifying restrictions (Id.).

When Plaintiff was next seen by Dr. Gruen on December 13, 2012, Plaintiff reported that he "continue[d] to have aches and pains worse with cold weather that [was] aggravated by excessive activity" (R. at 230). In particular, he had "helped a friend doing some routine housework for 4 hours and then was in severe pain in the following 2 days" (Id.). He also reported that he had been exercising at the gym "as much as he [could] to strengthen his right

leg," but he was "very limited with motion secondary to pain" (Id.). Following his examination, Dr. Gruen noted that Plaintiff was "doing relatively well" (Id.). However, "[b]ecause of his severe subtalar dislocation, he [was] unable to invert his foot and [was] therefore expected to have pain with prolonged activity" (Id.). Dr. Gruen also remarked that Plaintiff would likely need fusion surgery in the future (Id.). Regarding Plaintiff's ability to return to work, Dr. Gruen noted, "He continues to be unable to go to work secondary to his disability. We anticipate that this will be permanent. He was formerly a housekeeper at Latrobe Hospital and the severity of this injury will preclude him from returning to work" (Id.).

Plaintiff returned to Dr. Gruen's office on October 17, 2013, at which time he reported that he still "had continued pain [in his right ankle] especially with weightbearing and long periods of standing" (R. at 470). He continued to have pain in his right knee, as well (Id.). "Given the severity of his injury," Dr. Gruen explained, "[Plaintiff] [was] doing well," albeit he did have "continued deformity" which rendered him unable to work (Id.). Upon examination, Plaintiff displayed a decreased range of motion with some pain; he also had tenderness to palpation of the lateral aspect of his right foot and with range of motion of the ankle joint (R. at 470). X-rays showed bony proliferation below the medial malleolus (Id.). While no factures were noted, there was evidence of degenerative joint disease to the ankle and subtalar joints, as well as the calcaneal cuboid joint (Id.). In the "Plan" portion of the note, Dr. Gruen remarked that Plaintiff "remain[ed] disabled and . . . unable to return to work for the deformity as well as pain . . . to his right lower extremity" (Id.). He also noted that Plaintiff's condition was unlikely to improve (Id.). For the time being, "[Plaintiff] will continue to do things that allow him to go about his daily activities," Dr. Gruen explained, "and at some point," he would likely need a fusion at the ankle and subtalar joints (Id.).

7

At his three-year follow-up appointment with Dr. Gruen in August 2014, Plaintiff reported that he had started to experience left knee pain, but otherwise had "been doing well" (R. at 476). Dr. Gruen noted, upon examination, that Plaintiff had "[m]ild tenderness about the ankle" (Id.). X-rays "show[ed] decreased tibiotalar joint space with heterotopic bone on [the] medial side" (Id.). With respect to his left knee, x-rays showed no evidence of injury. (Id.). Plaintiff was diagnosed with patellofemoral disease and instructed to perform strengthening exercises (Id.).

### D. The ALJ's Decision

After a consideration of the foregoing evidence, the ALJ, applying the five-step sequential evaluation process, determined that Plaintiff is not "disabled." The ALJ found that Plaintiff has the following "severe" impairments: "arthritis of the right knee and right ankle, status post surgical repair following a motor vehicle accident and osteopenia." (R. at 24). At step three, the ALJ considered whether these impairments, alone or in combination, met the requirements "of any listing, paying particular attention . . . to Listing 1.02."[3] (Id.). While the

---

[3] Listing 1.02 provides:

> Major dysfunction of a join(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or

8

ALJ noted that Plaintiff "does have impairment of the right knee and ankle, physical therapy notes from 2012 show the claimant is able to ambulate effectively without the use of any assistive device" (Id.). Thus, the criteria of Listing 1.02 were not met. The ALJ proceeded to formulate Plaintiff's residual functional capacity ("RFC"), concluding that he has the RFC "to perform light work as defined in 20 CFR 404.1567(b) except [Plaintiff] would require a sit/stand option" (Id.). At step five, the ALJ concluded, on the basis of the VE's testimony, that Plaintiff could perform jobs that exist in significant numbers in the national economy – namely, photocopy machine operator, folding machine operator, and retail marker – and, thus, is not "disabled" within the meaning of the Act (R. at 30).

### III. <u>Standard of Review</u>

This Court's review is plenary with respect to all questions of law. <u>Schaudeck v. Comm'r of Soc. Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a

---

> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Subpt. P, App. 1, § 1.02.

conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988). A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A).

To support his ultimate findings, an ALJ must do more than simply state factual conclusions. The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). This entails making specific findings of fact. Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. Sec. & Exch. Comm'n v. Chenery Cor, 332 U.S. 194, 196 (1947). The Third Circuit Court of Appeals has recognized the applicability of this rule in the Social Security disability context. Fargnoli v. Massanari, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. Cefalu v. Barnhart, 387 F.Su2d 486, 491 (W.D. Pa. 2005).

**IV.    Discussion**

In moving for summary judgment, Plaintiff argues that the ALJ (A) failed to properly consider whether he met Listing 1.06; (B) failed to include "uncontradicted limitations" in his RFC assessment; and (C) failed to analyze relevant medical evidence in his decision. These arguments will be addressed *seriatim*.

A.  **Listing 1.06**

Plaintiff maintains that the ALJ should have addressed whether he satisfied Listing 1.06 "based not only on evidence of a double non-union in Plaintiff's right lower extremity, but also on the fact that the DDS analysis initially raised consideration of Listing 1.06 during the application process." (ECF No. 18 at 14).

While the ALJ did not expressly cite Listing 1.06,[4] he did note that Plaintiff did not satisfy the criteria "of any listing." (R. at 24). And in analyzing whether Plaintiff met the criteria of Listing 1.02, which like Listing 1.06 requires proof of an inability to "ambulate effectively," the ALJ found that Plaintiff "is able to ambulate effectively without the use of any assistive device." (Id.). This conclusion is supported by substantial evidence.

Listing 1.06 is satisfied if the claimant has a "[f]racture of the femur, tibia, pelvis, or one or more of the tarsal bones" along with "A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." 20 C.F.R., Subpt. P, App. 1, § 1.06. "Inability to ambulate effectively means an *extreme limitation* of the ability to walk; i.e., an impairment(s) that interferes *very seriously*

---

[4] To the extent Plaintiff believes he is entitled to a remand because the ALJ did not expressly cite Listing 1.06, he is mistaken. The Third Circuit has held that a "bare conclusory statement that an impairment did not match or is not equivalent to, a listed impairment [is] insufficient" to satisfy the ALJ's burden at step three. Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004) (citing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000)). However, "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id. The ALJ's decision in this case, read as a whole, is more than sufficient to permit the Court to engage in the type of meaningful review Burnett requires. He considered the evidence, evaluated it in light of the requirements of Listing 1.02 – which overlap, in pertinent part, with the requirements of Listing 1.06 – and gave a reasoned basis for his conclusion. While a citation to Listing 1.06 would have made for a clearer record, the ALJ was not *required* to go any further than he did.

with the individual's ability to independently initiate, sustain, or complete activities." Id. § 1.00(B)(2)(b)(1) (emphasis added). It is "defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. "[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Id. § 1.00(B)(2)(b)(2). Conversely, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." Id.

As the ALJ found, it is beyond dispute that Plaintiff does not require a cane to assist with ambulation.[5] He can also walk up and down stairs, though he only does so once or twice a day. (R. at 48). Moreover, although Plaintiff no doubt continues to experience the lingering effects of his accident and the surgery that followed, there is no indication in the record that he experiences any of the "examples of ineffective ambulation" set forth in the regulations. Thus, the ALJ did not commit reversible error at step three.

---

[5] Plaintiff argues that the ALJ should not have relied on the physical therapy notes documenting his progress because "physical therapy notes alone are not an acceptable medical source[.]" (ECF No. 18 at 15). The Court disagrees. While a physical therapist might not be an "acceptable medical source," that does not mean that treatment notes from a physical therapist are not relevant medical evidence that the ALJ must consider in rendering his decision. See Hatton v. Comm'r of Soc. Sec. Admin., 131 F. App'x 877, 878 (3d Cir. 2005) (explaining that although a "physical therapist is not an acceptable medical source," "[s]tatements from a physical therapist are entitled to consideration as additional evidence"). At any rate, Plaintiff's ability to ambulate effectively is not only documented in the physical therapy notes, but also in the notes from Dr. Gruen.

B.  RFC Assessment

Plaintiff next argues that remand is required because the ALJ's RFC assessment failed to include environmental and postural limitations found by Dr. Armanious and the state agency examiner and because "the ALJ failed to define the intervals of his sit-stand option."

1.  **Environmental and Postural Limitations**

With regard to environmental restrictions, Dr. Armanious opined that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, extreme cold, extreme heat, and vibrations; and could only occasionally tolerate exposure to operating a motor vehicle; dust, odors, fumes and pulmonary irritants; and loud noises. (R. at 462). Similarly, the state agency examiner noted that Plaintiff should "[a]void even moderate exposure" to hazards such as machinery and heights. (R. at 65).

As Plaintiff points out, the ALJ made no specific reference to these limitations. But even the Court were to conclude that the ALJ's failure to do so amounts to an error, it would be a harmless one because "the environmental restrictions placed on [P]laintiff, including the restriction on being around dangerous machinery and on unprotected elevations, are not restrictions that have a significant effect on work at any exertional level, let alone the light exertional level." Wood v. Barnhart, No. CIV.05-0432 SLR, 2006 WL 2583097, at *12 (D. Del. Sept. 7, 2006). Indeed, Plaintiff has not pointed to anything that suggests that the three jobs identified by the VE require exposure to any environmental hazards.

As for postural limitations, Dr. Armanious opined that Plaintiff could never climb stairs, ramps, ladders, or scaffolds; balance; stoop; kneel; crouch; or crawl. (R. at 461). The ALJ acknowledged these limitations but found that they were "not consistent with the objective evidence in the record." (R. at 28). In particular, the ALJ explained:

14

> Rehab notes show the claimant was independent in transfers and in balancing before he was discharged home in October 2011. He was able to climb stairs, though he chooses to limit the number of times per day that he does so, secondary to his reported pain. Moreover, the claimant has no musculoskeletal impairment that would limit stooping, which is considered to be a postural activity involving bending the head and body forward and down. Indeed, this movement is integral to the action of sitting down, and the claimant reported that he was able to do so, since he sits down in his recliner in order to elevate his leg and he acknowledged that he was able to drive, again involving assuming a seated position in his vehicle. Since the remainder of the described limitations appear to be those that the claimant reported to Dr. Armanious and not those observed independently, the undersigned gives little weight to her opinion.

(R. at 28-29).

These are legally sufficient reasons for discounting Dr. Armanious's opinions about Plaintiff's claimed postural limitations, and none of the arguments advanced by Plaintiff convince the Court otherwise. Contrary to what Plaintiff argues, the ALJ did not improperly use "rehab" observations by a "non-medical source (a physical therapist assistant)" to reject opinions from a consultative examiner. What the ALJ did was determine that, in light of the other evidence in the record – specifically those observations in the treatment notes – Dr. Armanious's opinions were not well supported and thus not entitled to significant weight. This was entirely proper. The Court likewise rejects Plaintiff's contention that the ALJ somehow misapplied the definition of stooping. In reaching an RFC assessment, the ALJ is required to consider a claimant's activities of daily living, such as his ability to get in and out of a chair and a car. See 20 C.F.R 416.920a(c)(3). Insofar as those activities belied Plaintiff's descriptions of his limitations, the ALJ was entitled to discount Plaintiff's testimony.

Moving on, in contrast to Dr. Armanious, the state agency examiner found that Plaintiff could occasionally climb, stoop, etc. (R. at 64). The ALJ, for his part, purported to give "considerable weight to the opinion of the state agency medical consultant." (R. at 29). Yet, he did not include any postural limitations in his RFC assessment. Nor did he acknowledge that the

state agency examiner had imposed such limitations. The lack of explanation for why the ALJ chose not to incorporate these limitations is confounding. Certainly, the ALJ has the authority to adopt portions of an opinion and reject others. But he must at least explain why. See Hawley v. Colvin, No. 1:13-CV-296, 2014 WL 3747686, at *7 (W.D. Pa. July 29, 2014) (explaining that the ALJ portions of an opinion while rejecting other as long as he "explain[ed] why the opinions that were inconsistent with his RFC assessment were not adopted").

Nevertheless, this does not provide grounds for remand because any error on the ALJ's part was harmless. Social Security Ruling 85–15 says that some limitation in climbing and balancing "would not ordinarily have a significant impact on the broad world of work." SSR 85–15, 1985 WL 56857, at *6 (S.S.A. 1985). Moreover, if a person can stoop or crouch occasionally, "the sedentary and light occupational base is virtually intact." Id. Likewise, crawling and kneeling are "relatively rare activit[ies] even in arduous work," and limitations on these activities "would be of little significance in the broad world of work." Id. Thus, even if the ALJ would have adopted the state agency examiner's findings wholesale, Plaintiff's occupational base would not have been eroded and the ALJ's ultimate conclusion would have been the same.

### 2. Sit-Stand Option

Plaintiff also contends that the ALJ erred by "fail[ing] to define the intervals between sitting and standing," but the Court does not agree. "Social Security Ruling 96–9p requires the ALJ to be specific as to frequency of an individual's need to alternate between sitting and standing when determining whether a claimant's limitations significantly erode the full range of sedentary work that might be available to the claimant." Hodge v. Barnhart, 76 F. App'x 797, 800 (9th Cir. 2003). But that section only applies to *sedentary* work. Tschannen v. Colvin, No. 15-182, 2015 WL 7012531, at *2 (W.D. Pa. Nov. 12, 2015). "The applicable regulation, SSR

83–12, does not require an ALJ to specify the frequency of the sit/stand option." Id. (citing Hanbey v. Astrue, 506 F. App'x 615, 617 (9th Cir. 2013)). When the ALJ does not define how often the claimant has to alternate between sitting and standing, it is implied that the claimant should be permitted to sit or stand at will. Id. (citing Campbell v. Colvin, No. 1:11CV327, 2014 WL 2815781, at *5 (M.D.N.C. June 23, 2014)).

The VE testified to just that at the hearing. "Generally," he said, the sit-stand option is "at will." (R. at 57). "If you literally had to sit or stand every minute," he added, "I think that clearly your productivity would fall below the 10 to 15 percent loss [in productivity] that we've talked about. I think what is reasonable . . . is every 10 minutes. It does allow the freedom to perform at acceptable speed while changing positions." (Id.). It is safe to assume, then, that all three of the jobs that the VE identified would allow for sitting and standing at will (or as frequently as every 10 minutes). Since Plaintiff has not pointed to anything which even so much as suggests that he needs the ability to alternate between sitting and standing more frequently (e.g., "every minute," which the VE conceded would substantially erode the number of jobs available), "'the Court will not remand the decision so that the ALJ can clarify the sit/stand option to be 'at will' and have the VE repeat the same testimony.'" Tschannen, 2015 WL 7012531, at *2.

### C. Failure to Analyze Relevant Medical Evidence

Lastly, Plaintiff submits that the ALJ failed to analyze two findings contained in the treatment notes from Dr. Gruen: one from December 13, 2012, which indicates that Plaintiff could not invert his right foot; and the other from June 28, 2012, which records the results of an x-ray showing that Plaintiff's fractured patella was incompletely healed and that his right ankle was fractured. As Plaintiff himself acknowledges, though, the ALJ is under no obligation "to reproduce every finding, from every medical record in a decision[.]" (ECF No. 18 at 13); see

17

Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001) ("[W]e do not expect the ALJ to make reference to every relevant treatment note[.]"); Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."). The ALJ's decision must simply make clear that he considered all relevant medical evidence and provided good reasons for rejecting conflicting evidence. See Fargnoli, 247 F.3d at 41.

The decision in this case meets that standard. True, the ALJ did not quote Dr. Gruen's statement that Plaintiff could not "invert his foot" and would continue "to have pain with prolonged activity." (R. at 230). But it is clear from the ALJ's discussion that he fully considered the contents of the December 13, 2012, treatment note to which Plaintiff makes reference. In point of fact, the ALJ observed that, as of December 13, 2012, Plaintiff "continued to have a limited range of motion in the right ankle along with some tenderness to palpation over the lateral aspect of the ankle." (R. at 26). This is an accurate statement.

Moreover, while Plaintiff is correct that the ALJ did not specifically cite the x-ray report from June 28, 2012, he has not explained how the ALJ's failure to consider this piece of evidence affected the ALJ's decision. The x-ray results are not particularly notable. The ALJ did not seem to dispute that Plaintiff had continued problems with his ankle and knee, as documented in the x-ray report. In fact, the ALJ recognized elsewhere in his decision that Plaintiff would continue to have deformity, mobility issues, and pain and that his condition was unlikely to improve much. (R. at 27). Nonetheless, based on his consideration of the entirety of the evidence, the ALJ concluded that Plaintiff was not "disabled." His failure to cite one x-ray result does not undermine that conclusion.

**V. Conclusion**

18

For the foregoing reasons, Plaintiff's motion for summary judgment will be denied, the Acting Commissioner's motion for summary judgment will be granted, and final judgment will be entered in favor of the Acting Commissioner and against Plaintiff. An appropriate Order follows.

Dated: March 28, 2017

_____
LISA PUPO LENIHAN
U.S. Magistrate Judge

cc: all counsel of record via CM/ECF